**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**BRIDGET O'NEILL, KIRK MOSES, MICHAEL NEWTON, NOEL CARTER, MARTIN KURTEV**, and **IZABELA DEBOWCZYK**, *individually and on behalf of all others similarly situated,*

Plaintiffs,

v.

**PERRY JOHNSON & ASSOCIATES, INC., COOK COUNY HEALTH & HOSPITALS SYSTEM,** and **COOK COUNTY HEALTH,**

Defendants.

Case No. 1:24-cv-4963

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Bridget O'Neill, Kirk Moses, Michael Newton, Noel Carter, Martin Kurtev, and Izabela Debowczyk ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), brings this class action against Defendants Perry Johnson & Associates, Inc., Cook County Health & Hospitals System, and Cook County Health (collectively, "Defendants"). Plaintiffs make the following allegations upon personal knowledge as to their own acts, and upon information and belief and their attorneys' investigation as to all other matters, and alleges as follows:

## INTRODUCTION

1. This class action arises out of a targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated highly-sensitive consumer data belonging to Plaintiffs and millions of Class Members (the "Data Breach").[1]

[1] U.S. Department of Health and Human Services, *Cases Currently Under Investigation*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Feb. 14, 2024); *see also* PJ&A,

2. Defendants Cook County Health and Cook County Health & Hospitals System (together, "Cook County Health") provide healthcare to more than 600,000 people annually in the Chicago, Illinois area. As part of conducting its affairs, Cook County Health acquires, collects, and stores patients' highly-sensitive personal data, including personally identifying information ("PII") and protected health information ("PHI") (collectively, "Private Information.").

3. Defendant Perry Johnson & Associates, Inc. ("PJ&A") is a third-party vendor of health information technology solutions that "provides medical transcription services to various healthcare organizations," including Cook County Health.[2] To facilitate the services rendered by PJ&A, Cook County Health shared the sensitive Private Information of its patients with PJ&A.

4. According to Defendant PJ&A, the Private Information compromised in the Data Breach included: patient names, dates of birth, addresses, medical record numbers, hospital account numbers, admission diagnoses, dates and times of service, Social Security numbers, insurance information and clinical information from medical transcription files, such as laboratory and diagnostic testing results, medications, names of treatment facilities, and names of healthcare providers.[3]

5. Defendants owed a non-delegable duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information. Yet, Defendants maintained and shared that Private Information in a negligent and/or reckless manner. In particular, the Private Information was maintained on computer systems in a condition vulnerable to cyberattacks. Upon information and

---

*Cyber Incident Notice*, https://www.pjats.com/downloads/Notice.pdf (last visited Feb. 14, 2024); Data Breach Notice, **Exhibit A**.

[2] PJ&A, *Cyber Incident Notice*, https://www.pjats.com/downloads/Notice.pdf (last visited Feb. 14, 2024).

[3] *Id.*

belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to ensure they properly safeguarded Plaintiffs' and Class Members' Private Information from those risks would leave the Private Information in a vulnerable condition.

6. Plaintiffs' and Class Members' Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and Defendants' failure to reasonably and adequately protect Plaintiffs' and Class Members' Private Information.

7. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including: opening new financial accounts and taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' Private Information to target other phishing and hacking intrusions, using Class Members' Private Information to obtain government benefits, and filing fraudulent tax returns using Class Members' Private Information.

8. As a result of the Data Breach, Plaintiffs and Class Members face a substantial risk of imminent and certainly impending harm, heightened here by the loss of Social Security numbers, a class of Private Information which is particularly valuable to identity thieves. Plaintiffs and Class Members have and will continue to suffer injuries associated with this risk, including but not limited to a loss of time, mitigation expenses, and anxiety over the misuse of their Private Information.

9. This risk is even more pronounced given the extended amount of time that lapsed between when the Data Breach occurred, when Defendants reportedly determined Plaintiffs' and

Class Members' Private Information was compromised, and when Defendants actually notified Plaintiffs and Class Members about the Data Breach.

10. Even those Class Members who have yet to experience identity theft have to spend time responding to the Data Breach and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiffs and Class Members have incurred, and will continue to incur, damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminished value of Private Information, loss of privacy, and/or additional damages as described below.

11. Accordingly, Plaintiffs bring this action against Defendants, seeking redress for Defendants' unlawful conduct and asserting claims for: (i) negligence; (ii) breach of implied contract; (iii) unjust enrichment; (iv) bailment; and (v) breach of fiduciary duty. Through these claims, Plaintiffs seek damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including improvements to Defendants' data security systems, policies, and practices, future annual audits, and adequate credit monitoring services funded by Defendants.

## **PARTIES**

12. Plaintiff Bridget O'Neill is a natural person, resident, and citizen of the State of Illinois, residing in Cook County.

13. Plaintiff Kirk Moses is a natural person, resident, and citizen of the State of Illinois, residing in Cook County.

14. Plaintiff Michael Newton is a natural person, resident, and citizen of the State of Illinois, residing in Cook County.

15. Plaintiff Noel Carter is a natural person, resident, and citizen of the State of Illinois, residing in Cook County.

16. Plaintiff Martin Kurtev is a natural person, resident, and citizen of the State of Illinois, residing in Cook County.

17. Plaintiff Izabela Debowczyk is a natural person, resident, and citizen of the State of Illinois, residing in Cook County.

18. Defendants obtained and continue to store and maintain Plaintiffs' Private Information. Defendants owe Plaintiffs a legal duty and obligation to protect their Private Information from unauthorized access and disclosure. Plaintiffs' Private Information was compromised and disclosed as a result of Defendants' inadequate data security practices, which resulted in the Data Breach.

19. Plaintiffs obtained healthcare or related services from Defendant Cook County Health. Cook County Health required Plaintiffs to provide their Private Information as a condition of receiving those services. Based on representations made by Cook County Health, Plaintiffs believed Cook County Health had implemented and maintained reasonable security procedures and practices to protect their Private Information.

20. Plaintiffs received notice letters from Defendants Cook County Health and PJ&A (the "Data Breach Notice") dated November 7, 2023, notifying them that their Private Information was compromised in the Data Breach.[4]

21. Defendant Cook County Health is an Illinois hospital system with its principal place of business at 4800 W. Chicago Avenue, Chicago, Illinois 60651.

---

[4] *See* Data Breach Notice, **Exhibit A**.

22. Defendant Cook County Health & Hospitals System is an agency of Illinois, established by ordinance of Cook County, Illinois, with its principal place of business in Cook County, Illinois. Cook County Health & Hospitals System provides healthcare services to its patients.

23. Defendant Perry Johnson & Associates, Inc. is a Nevada corporation with its headquarters in Troy, Michigan.

## JURISDICTION AND VENUE

24. This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs, and at least one member of the putative Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 putative class members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

25. This Court has personal jurisdiction over Defendant Perry Johnson & Associates, because it transacts business within this District and makes or performs contracts within this District.

26. This Court has personal jurisdiction over Defendant Cook County Health because it transacts business within this District and makes or performs contracts within this District.

27. This Court has personal jurisdiction over Defendant Cook County Health and Hospitals System because it transacts business within this District and makes or performs contracts within this District.

28. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

## DEFENDANTS' BUSINESSES

29. Cook County Health provides health care to more than 600,000 people annually in the Chicago, Illinois area. It "oversees a comprehensive, integrated system of healthcare throughout Chicago and suburban Cook County Health through its seven affiliates: three hospitals, a growing ambulatory and community health network, a public health department, a correctional healthcare facility, and an outpatient infectious disease center."[5]

30. In the regular course of its business, Cook County Health collects and maintains the PII and PHI of its current and former patients. Cook County Health required Plaintiffs and the other Class members to provide their PII and PHI as a condition of receiving healthcare services from Cook County Health.

31. On information and belief, in the ordinary course of its business of providing services, Defendant Cook County Health maintains the Private Information of consumers, including but not limited to:

- Name, address, phone number and email address;
- Date of birth;
- Demographic information;
- Social Security number or taxpayer identification number;
- Financial and/or payment information;
- Health billing information;
- Information relating to individual medical history;
- Information concerning an individual's doctor, nurse, or other medical providers;

[5] *Cook County Health*, COOK COUNTY HEALTH AND HOSPITALS SYSTEMS, https://commissioneranaya.com/health-hospital-system/ (last accessed Nov. 18, 2023).

- Medication information;
- Health information; and
- Other information that Defendant Cook County Health may deem necessary to provide services and care.

32. Additionally, Cook County Health may receive Private Information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, customers' other doctors, customers' health plan(s), close friends, and/or family members.

33. On its website, Cook County Health promises that it "[c]omplies with the privacy management provisions of the Health Insurance Portability and Accountability Act (HIPAA), the Health Information Technology for Economic and Clinical Health Act (HITCH) and other state and federal laws protecting the confidentiality of health information across the system."[6]

34. Cook County Health has a Notice of Privacy Practices that also states that it is "required by law to protect the privacy of your health information and to provide you with this information and if you are affected, to notify you following a breach of unsecured protected health information. State and federal privacy laws strengthen our commitment to you, as our patient, to carefully maintain your confidentiality."[7]

35. The Privacy Policy includes a list of the ways Cook County Health may use and disclose its patients' health information, including for treatment, payment, and health care

---

[6] *Mandates and Key Activities*, COOK COUNTY HEALTH AND HOSPITALS SYSTEMS, https://www.cookcountyil.gov/agency/health-and-hospitals-system (last accessed Nov. 18, 2023).

[7] *Notice of Privacy Practices*, COOK COUNTY HEALTH AND HOSPITALS SYSTEMS, https://cookcountyhealth.org/wp-content/uploads/2019_01.01.50-Notice-of-Privacy-Practices-English.pdf (last accessed Nov. 18, 2023).

operations, among others. The Privacy Policy promises that disclosures not described in the Notice or permitted by law will be made only with patients' written authorization.[8]

36. Plaintiffs and Class Members are current or former patients of Cook County Health and entrusted Cook County Health with their Private Information as a condition of receiving healthcare and related services from Cook County Health.

37. Defendant PJ&A "provides medical transcription services to various healthcare organizations."[9] Cook County Health used PJ&A for medical transcription and dictation services.[10]

38. Because of the highly sensitive and personal nature of the information Defendants acquire and store with respect to consumers and other individuals, Defendants, upon information and belief, promise to, among other things: keep Private Information private; comply with healthcare industry standards related to data security and Private Information, including FTC guidelines; inform consumers of its legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to the products and services Plaintiffs and Class Members obtain from Defendants and provide adequate notice to individuals if their Private Information is disclosed without authorization.

39. As HIPAA covered business entities, Defendants are required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including

---

[8] *Id.*

[9] PJ&A, *Cyber Incident Notice*, https://www.pjats.com/downloads/Notice.pdf (last visited Feb. 14, 2024).

[10] *See* Kevin Vesey, *Cyberattack Targets Northwell Health Vendor; Patient Data Compromised*, NEWS12 (Nov. 9, 2023 6:52 PM), https://longisland.news12.com/northwell-health-vendor-patient-information-may-have-been-impacted-by-data-breach; *see also* Jill McKeon, *Medical Transcription Service Data Breach Impacts Multiple Health Systems*, TECHTARGET (Nov. 16, 2023), https://healthitsecurity.com/news/medical-transcription-service-data-breach-impacts-multiple-health-systems.

by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured PHI, as in the case of the Data Breach complained of herein.

40. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

41. However, Defendants did not maintain adequate security to protect their systems from infiltration by cybercriminals. Contrary to their representations, Defendants failed to implement adequate data security measures, as evidenced by Defendants' admission of the Data Breach, which affected nearly 9,000,000 individuals.[11]

42. Defendant PJ&A waited more than two months after it first became aware of suspicious activity on its systems to notify Defendant Cook County Health "that an unauthorized third party had accessed and downloaded certain files from our systems, and that this data included CCH [Cook County Health] data."[12] Cook County Health waited over three additional months to begin informing patients that their Private Information was affected by the Data Breach.[13]

**<u>Defendants are Covered Entities Subject to HIPAA</u>**

43. Defendants are HIPAA covered entities, providing services to millions of patients annually. As a regular and necessary part of their businesses, Defendants collect the highly sensitive Private Information of patients. As covered entities, Defendants are required under

---

[11] U.S. Department of Health and Human Services, *Cases Currently Under Investigation*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Feb. 14, 2024).
[12] *See* PJ&A, *Cyber Incident Notice*, https://www.pjats.com/downloads/Notice.pdf (last visited Feb. 14, 2024); Data Breach Notice, **Exhibit A**.
[13] *Id.*

federal and state law to maintain the strictest confidentiality of the Private Information that they acquire, receive, collect, and store. Defendants are further required to maintain sufficient safeguards to protect that Private Information from being accessed by unauthorized third parties.

44. Indeed, PJ&A recognizes the importance of its obligations under HIPAA on its own webpage, where PJ&A claims that its platform enables HIPAA compliance "through advanced technology for dictation, transcription and patient data accessibility."[14]

45. Due to the nature of Defendants' businesses, which includes obtaining, storing, and maintaining electronic health records, Defendants would be unable to engage in their regular business activities without collecting and aggregating Private Information that they know and understand to be sensitive and confidential.

46. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

47. Plaintiffs and Class Members are or were patients, or are the executors or surviving spouses of patients, whose Private Information was maintained by Defendants and directly or indirectly entrusted Defendants with their Private Information.

48. Plaintiffs and Class Members relied on Defendants to implement and follow adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for business and healthcare purposes, and to prevent unauthorized disclosures of Private Information. Plaintiffs and Class Members

[14] PJ&A, *HIPAA Compliancy*, https://www.pjats.com/hipaa-compliancy/ (last accessed Nov. 20, 2023).

reasonably expected that Defendants would safeguard their highly sensitive information and keep that Private Information confidential.

49. As described throughout this Complaint, Defendants did not reasonably protect, secure, or store Plaintiffs' and Class Members' Private Information prior to, during, or after the Data Breach, but rather, enacted unreasonable data security measures that they knew or should have known were insufficient to reasonably protect the highly sensitive Private Information they maintained. Consequently, cybercriminals circumvented Defendants' security measures, resulting in a significant data breach.

**THE DATA BREACH AND NOTICE LETTER**

50. According to the notices posted on Defendants' websites and the notice letter sent to Plaintiffs dated November 7, 2023 (the "Data Breach Notice"),[15] Defendant PJ&A "determined that an unauthorized party had accessed and downloaded certain files from [PJ&A's] systems, and this data included [Cook County Health] data."[16]

51. The Data Breach Notice reads: "[o]n May 2, 2023, PJ&A became aware of suspicious activity on its systems."[17] In response, "PJ&A launched an investigation, with the assistance of third-party cybersecurity specialists, to determine the nature and scope of the event. The investigation determined that between March 27, 2023 and May 2, 2023, an unauthorized actor gained access to certain PJ&A systems and that information contained within those systems was accessible to the unauthorized actor."[18]

[15] PJ&A, *Cyber Incident Notice*, https://www.pjats.com/downloads/Notice.pdf (last visited Feb. 14, 2024); Data Breach Notice, **Exhibit A**.
[16] *Id.*
[17] *Id.*
[18] *Id.*

52. According to PJ&A, PJ&A notified Cook County Health "that an unauthorized party had accessed and downloaded certain files from [PJ&A's] systems, and this data included [Cook County Health] data" on July 21, 2023.[19]

53. Thus, PJ&A waited more than two months after it first became aware of suspicious activity on its systems to notify Cook County Health that its patients' Private Information was compromised in the Data Breach.[20] Cook County Health waited over three additional months to begin informing patients that their Private Information was affected by the Data Breach.[21]

54. The Private Information compromised in the Data Breach included: patient names, dates of birth, addresses, medical record numbers, hospital account numbers, admission diagnoses, dates and times of service, Social Security numbers, insurance information and clinical information from medical transcription files, such as laboratory and diagnostic testing results, medications, names of treatment facilities, and names of healthcare providers.[22]

55. Defendants' failure to promptly notify Plaintiffs and Class Members that their Private Information was accessed and stolen allowed cybercriminals to monetize, misuse, or disseminate that Private Information before Plaintiffs and Class Members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class Members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

---

[19] *Id.*

[20] *See* PJ&A, *Cyber Incident Notice*, https://www.pjats.com/downloads/Notice.pdf (last visited Feb. 14, 2024); Data Breach Notice, **Exhibit A**.

[21] *Id.*

[22] PJ&A, *Cyber Incident Notice*, https://www.pjats.com/downloads/Notice.pdf (last visited Feb. 14, 2024).

56. The accessed data contained Private Information that was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by the unauthorized actor.

57. As HIPAA covered business entities that collect, create, and maintain significant volumes of Private Information, the targeted attack was a foreseeable risk which Defendants were aware of and knew they had a duty to guard against. It is well-known that healthcare providers and their business associates, such as Defendants, which collect and store the confidential and sensitive Private Information of millions of individuals, are frequently targeted by cyberattacks. Further, cyberattacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training.

58. The targeted cyberattack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients, like Plaintiffs and Class Members.

59. Defendants had obligations created by HIPAA, contract, industry standards, common law, and their own promises and representations made to Plaintiffs and Class Members to keep their Private Information confidential and protected from unauthorized access and disclosure.

60. Plaintiffs and Class Members entrusted Defendants (or their doctors and healthcare providers) with their Private Information with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

61. Due to Defendants' inadequate security measures and their delayed notice to victims, Plaintiffs and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

**The Data Breach was a Foreseeable Risk of Which Defendants Were on Notice**

62. As HIPAA-covered entities handling medical patient data, Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the Data Breach.

63. At all relevant times, Defendants knew, or should have known that Plaintiffs' and Class Members' Private Information was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class Members' Private Information from cyberattacks that Defendants should have anticipated and guarded against.

64. In light of recent high profile data breaches at other health care providers, Defendants knew or should have known that their electronic records and consumers' Private Information would be targeted by cybercriminals and ransomware attack groups

65. Cybercriminals target institutions which collect and store PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company, Protenus, found that there were at least 905 health data breaches in 2021, impacting over 50 million patients. The report noted that "the volume and impact of breaches continue to be underreported overall, and underrepresented to the public[,]" stressing that "gaps in detection and reporting mean the true impact of incidents is likely even greater."[23]

[23] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/hubfs/Breach_Barometer/BreachBarometer_Privacy_2022_Protenus.pdf?utm_campaign=Forbes%2520Articles&utm_source=forbes&utm_medium=article&utm_content=breach%2520barometer (last visited Dec. 11, 2023).

66. The healthcare sector suffered at least 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[24]

67. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

68. Indeed, cyberattacks against the healthcare industry have been common for over a decade, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII[.]" The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[25]

[24] *See* Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, HEALTH IT SECURITY: CYBERSECURITY NEWS (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.
[25] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

69. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[26] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[27] A study by Experian found that the "average total cost" of medical identity theft was "about $20,000" per incident in 2010, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[28]

70. In fact, according to the cybersecurity firm Mimecast, 90 percent of healthcare organizations experienced cyberattacks in 2020.[29]

71. Cyberattacks on medical systems have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[30]

72. According to an article in the HIPAA Journal posted on November 2, 2023, cybercriminals hack into medical practices for their highly prized medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw

---

[26] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[27] *Id.*
[28] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.
[29] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.
[30] *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights (OCR)] – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[31]

73. Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[32] In this case, Defendants stored the records of *millions* of patients.

74. Private Information, like that stolen in the Data Breach, is "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[33]

75. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

76. Defendants were on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The

[31] Steve Alder, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA JOURNAL (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.
[32] *See id.*
[33] *See id.*

warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[34]

77. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[35]

78. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiffs and Class Members.

79. The U.S. Department of Health and Human Services and the Office of Consumer Rights urges the use of encryption of data containing sensitive personal information. As far back as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, formerly OCR's deputy director of health information privacy, stated in 2014 that

[34] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idINKBN0GK24U20140820.

[35] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

"[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[36]

80. As HIPAA covered entities, Defendants should have known about their data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in their unprotected files.

**Defendants Fail to Comply with FTC Guidelines**

81. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

82. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[37] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and, have a response plan ready in the event of a breach.[38]

---

[36] Susan D. Hall, *OCR levies $2 million in HIPAA fines for stolen laptops*, Fierce Healthcare (Apr. 23, 2014), https://www.fiercehealthcare.com/it/ocr-levies-2-million-hipaa-fines-for-stolen-laptops.

[37] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[38] *Id.*

83. The FTC further recommends that companies not maintain PII longer than necessary for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

84. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

85. These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

86. Defendants failed to properly implement basic data security practices.

87. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

88. Defendants were at all times fully aware of their obligations to protect the Private Information of customers and patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**Defendants Fail to Comply with Industry Standards**

89. As shown above, experts studying cybersecurity routinely identify healthcare providers and partners as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

90. Several best practices have been identified that at a minimum should be implemented by healthcare service providers like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

91. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

92. On information and belief, Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**<u>Defendants' Conduct Violates HIPAA Obligations to Safeguard Private Information</u>**

94. As a healthcare service providers handling medical patient data and providing services to hospitals and healthcare organizations, Defendants are covered entities under HIPAA (45 C.F.R. § 160.103) and are required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

95. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

96. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

97. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

98. HIPAA covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

99. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendants left unguarded. The HHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These

rules include 45 C.F.R. § 164.306 (a)(1-4); 45 C.F.R. § 164.312 (a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308 (a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

100. A Data Breach such as the one Defendants experienced, is considered a breach under the HIPAA Rules because it involved an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40

101. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires HIPAA covered entities and their business associates, like Defendants, to provide notification following a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—i.e. non-encrypted data—to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[39]

102. The Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

**Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft**

103. Cyberattacks and data breaches at healthcare service providers like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

---

[39] U.S. Dep't of Health & Human Services, *Breach Notification Rule*, https://www.hhs.gov/hipaa/forprofessionals/breach-notification/index.html (emphasis added).

104. Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[40]

105. Researchers have further found that for medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes.[41]

106. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[42]

107. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login

---

[40] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[41] *See* Sung J. Choi, et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

[42] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf.

credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

108. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[43]

109. Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

110. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

---

[43] *See IdentityTheft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last visited Dec. 11, 2023).

111. Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[44]

112. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

113. It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

114. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> GAO Report at 29.

115. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

---

[44] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

116. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts, or the accounts of deceased individuals for whom Class Members are the executors or surviving spouses, for many years to come.

117. Private Information can sell for as much as $363 per record according to the Infosec Institute.[45] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

118. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[46] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[47] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

119. Moreover, it is not an easy task to change or cancel a stolen Social Security number.

120. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the

---

[45] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[46] *Identity Theft and Your Social Security Number*, Social Security Administration (July 2021), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.
[47] *Id.*

old number, so all of that old bad information is quickly inherited into the new Social Security number."[48]

121. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[49]

122. Medical information is especially valuable to identity thieves.

123. Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[50]

124. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

125. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

---

[48] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[49] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[50] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Dec. 11, 2023).

126. For this reason, Defendants knew or should have known about these dangers and strengthened their data and email handling systems accordingly. Defendants were on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendants failed to properly prepare for that risk.

**DEFENDANTS' DATA BREACH**

127. Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' and customers' Private Information;

c. Failing to properly monitor their own data security systems for existing intrusions;

d. Failing to ensure that their vendors with access to their computer systems and data employed reasonable security procedures;

e. Failing to train their employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

f. Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h. Failing to implement policies and procedures to prevent,

detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l. Failing to ensure compliance with HIPAA security standard rules by their workforces in violation of 45 C.F.R. § 164.306(a)(4);

m. Failing to train all members of their workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n. Failing to render the electronic Private Information they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

o. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

p. Failing to adhere to industry standards for cybersecurity as discussed above; and

q. Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

128. Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access Defendants' computer network and systems for multiple days which contained unsecured and unencrypted Private Information.

129. Accordingly, as outlined below, Plaintiffs and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

**<u>Plaintiffs' and Class Members' Damages</u>**

130. Given the sensitivity of the Private Information involved in this Data Breach, Plaintiffs and Class Members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Defendants have done nothing to compensate Plaintiffs or Class Members for many of the injuries they have already suffered. Defendants have not demonstrated any efforts to prevent additional harm from befalling Plaintiffs and Class Members as a result of the Data Breach.

131. Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

132. Plaintiffs' and Class Members' demographic information, dates of birth, and Social Security Numbers were all compromised in the Data Breach and are now in the hands of the cybercriminals.

133. Since being notified of the Data Breach, Plaintiffs have spent time dealing with the impact of the Data Breach, valuable time Plaintiffs otherwise would have spent on other activities, including but not limited to work and/or recreation.

134. Due to the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes

changing passwords, cancelling credit and debit cards, and monitoring his accounts for fraudulent activity.

135. Plaintiffs' and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

136. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

137. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been forced to spend time dealing with the effects of the Data Breach.

138. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

139. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiffs' and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

140. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

141. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

142. Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price Plaintiffs and Class Members paid to Defendants and/or Defendants' healthcare partners was intended to be used by Defendants to fund adequate security of their computer system(s) and Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and Class Members did not get what they paid for and agreed to.

143. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

144. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

145. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

146. Further, as a result of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life, including what ailments they suffer, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

147. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

**Plaintiffs' Experiences**

148. Plaintiffs obtained healthcare or related services from Defendant Cook County Health. Cook County Health required Plaintiffs to provide their Private Information as a condition of receiving those services. Based on representations made by Cook County Health, Plaintiffs believed Cook County Health had implemented and maintained reasonable security procedures and practices to protect their Private Information.

149. According to the Data Breach Notice letter Plaintiffs received, their Private Information was impacted in the Data Breach.[51]

[51] *See* Data Breach Notice, **Exhibit A**.

150. Upon information and belief, Plaintiffs were presented with standard forms to complete prior to receiving medical services that required his PII and PHI. Upon information and belief, Defendants received and maintain the information Plaintiffs were required to provide to their doctors or medical professionals. Plaintiffs also believe they were presented with standard HIPAA privacy notices before disclosing their Private Information to his medical provider(s).

***Bridget O'Neill***

151. Plaintiff O'Neill is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location or destroys the documents. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts.

152. As a result of the Data Breach, Plaintiff O'Neill made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit.

153. Plaintiff O'Neill was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This is time that is lost forever and cannot be recaptured.

154. Plaintiff O'Neill suffered actual injury and damages from having her Private Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff and/or Plaintiff's doctors and medical professionals; (b) violation of his privacy rights; (c) the theft of his Private Information; (d) loss of time; (e) imminent

and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of her bargain; and (g) nominal and statutory damages.

155. Plaintiff O'Neill has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to her Social Security number, medical records, and prescriptions.

156. As a result of the Data Breach, Plaintiff O'Neill anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

157. Plaintiff O'Neill has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Kirk Moses***

158. Plaintiff Moses is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII or PHI in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. Plaintiff Moses would not have entrusted his PII or PHI to Defendant had he known of Defendants' lax data security policies.

159. As a result of the Data Breach, and at the direction of Defendants' Notice, Plaintiff Moses made reasonable efforts to mitigate the impact of the Data Breach, including changing his passwords and monitoring his financial accounts for fraudulent activity.

160. Plaintiff Moses was forced to spend significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

161. Plaintiff Moses suffered actual injury and damages from having his Private Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff and/or Plaintiff's doctors and medical professionals; (b) violation of his privacy rights; (c) the theft of his Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of her bargain; and (g) nominal and statutory damages.

162. Plaintiff Moses has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of his Private Information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to her Social Security number, medical records, and prescriptions.

163. As a result of the Data Breach, Plaintiff Moses anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

164. Plaintiff Moses has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Michael Newton***

165. Plaintiff Newton is very careful with his Private Information. He stores any documents containing his Private Information in a safe and secure location or destroys the documents. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts.

166. As a result of the Data Breach, Plaintiff Newton made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit.

167. Plaintiff Newton was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. He will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This is time that is lost forever and cannot be recaptured.

168. Despite these precautions, Plaintiff Newton has noticed a significant uptick in spam text messages and emails in the aftermath of the Data Breach, and has had to dedicate increasing time to monitoring his accounts and credit for fraudulent activity.

169. Plaintiff Newton suffered actual injury and damages from having his Private Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff Newton and/or Plaintiff Newton's doctors and medical professionals; (b) violation of his privacy rights; (c) the theft of his Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of his bargain; and (g) nominal and statutory damages.

170. Plaintiff Newton has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of his Private Information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to his Social Security number, medical records, and prescriptions.

171. As a result of the Data Breach, Plaintiff Newton anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Newton will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

172. Plaintiff Newton has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Noel Carter***

173. On or about November 7, 2023, Noel Carter, a citizen and resident of Chicago, Illinois, received Notice of Data Security Incident Letter by US. Mail.

174. As a patient of CCH, she provided her Private Information to Defendants as part of their medical services, and under state and federal law, she was required to do so. She reasonably relied on CCH, a sophisticated hospital and healthcare company, and its transcription service provider, PJ&A, to protect the security of her Private Information.

175. As a result of the Data Breach and the information that she received in the Notice Letter, Plaintiff Carter has spent many hours dealing with the consequences of the Data Breach (reviewing bank accounts, considering changing banks, changing passwords), as well as her time

spent verifying the legitimacy of the Notice of Data Security Incident, exploring credit monitoring and identity theft insurance options, and other inconveniences. This time has been lost forever and cannot be recaptured.

176. As a result of the Data Breach, Plaintiff Carter was the targeted victim of various phishing attempts via telephone calls, voicemails, text messages, and email.

177. Plaintiff Carter is very careful about sharing her own personal identifying information and has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

178. Plaintiff Carter stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

179. Plaintiff Carter suffered actual injury and damages due to Defendants' mismanagement of her Private Information before the Data Breach.

180. Plaintiff Carter suffered actual injury in the form of damages and diminution in the value of her Private Information —a form of intangible property that she entrusted to Defendants, which was compromised in and as a result of the Data Breach

181. Plaintiff Carter suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and she has suffered anxiety and increased concerns for the theft of her privacy since she received the Notice Letter.

182. Plaintiff Carter has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her stolen Private Information being placed in the hands of unauthorized third parties and possibly criminals.

183. Plaintiff Carter has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Martin Kurtev***

184. On November 14, 2023, Plaintiff Kurtev received notice from Defendants that his PHI had been improperly accessed and obtained by unauthorized third parties.

185. Plaintiff Kurtev is very careful with his Private Information. He stores any documents containing his Private Information in a safe and secure location or destroys the documents. Plaintiff Kurtev has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff Kurtev diligently chooses unique usernames and passwords for his various online accounts.

186. As a result of the Data Breach, Plaintiff Kurtev made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit.

187. Plaintiff Kurtev was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. He will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This is time that is lost forever and cannot be recaptured.

188. Plaintiff Kurtev suffered actual injury and damages from having his Private Information compromised as a result of the Data Breach including, but not limited to: (a) damage

to and diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff and/or Plaintiff's doctors and medical professionals; (b) violation of his privacy rights; (c) the theft of his Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of his bargain; and (g) nominal and statutory damages.

189. Plaintiff Kurtev has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of his Private Information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to his Social Security number, medical records, and prescriptions.

190. As a result of the Data Breach, Plaintiff Kurtev anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Kurtev will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

191. Plaintiff Kurtev has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Izabela Debowczyk***

192. On November 14, 2023, Plaintiff Debowczyk received notice from Defendants that his PHI had been improperly accessed and obtained by unauthorized third parties.

193. Plaintiff Debowczyk is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location or destroys the

documents. Plaintiff Debowczyk has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff Debowczyk diligently chooses unique usernames and passwords for her various online accounts.

194. As a result of the Data Breach, Plaintiff Debowczyk made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring her credit.

195. Plaintiff Debowczyk was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This is time that is lost forever and cannot be recaptured.

196. Plaintiff Debowczyk suffered actual injury and damages from having her Private Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff and/or Plaintiff's doctors and medical professionals; (b) violation of her privacy rights; (c) the theft of her Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of her bargain; and (g) nominal and statutory damages.

197. Plaintiff Debowczyk has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff Debowczyk has also suffered anxiety about unauthorized parties viewing, using,

and/or publishing information related to her Social Security number, medical records, and prescriptions.

198. As a result of the Data Breach, Plaintiff Debowczyk anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Debowczyk will continue to be at a present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

199. Plaintiff Debowczyk has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

200. Plaintiffs bring this action against Defendants individually and on behalf of all other persons similarly situated (the "Class").

201. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> **All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who Defendants identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.**

202. Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

203. Plaintiffs reserve the right to amend or modify the Class definition or create additional subclasses as this case progresses.

204. Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. The U.S. Department of Health and Human Services investigation reports that at nearly 9,000,000 were impacted by Defendants' Data Breach.[52]

205. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, e.g., HIPAA;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Plaintiffs and Class Members to safeguard their Private Information;

f. Whether Defendants breached their duty to Plaintiffs and Class Members to safeguard their Private Information;

g. Whether Defendants knew or should have known that their data security

[52] U.S. Department of Health and Human Services, Currently Under Investigation, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Feb. 14, 2024).

systems and monitoring processes were deficient;

h. Whether Defendants should have discovered the Data Breach sooner;

i. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j. Whether Defendants' conduct was negligent;

k. Whether Defendants breach implied contracts with Plaintiffs and Class Members;

l. Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m. Whether Defendants failed to provide notice of the Data Breach in a timely manner, and;

n. Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

206. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

207. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

208. Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the data of Plaintiffs and Class Members were stored on the same network and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized

issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

209. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

210. Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

211. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the public of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

212. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## CLAIMS FOR RELIEF

### COUNT I
**Negligence**
**(*By Plaintiffs Individually and on Behalf of the Class*)**

213. Plaintiffs re-allege and incorporate by reference paragraphs 1-212 as if fully set forth herein.

214. By collecting and storing the Private Information of Plaintiffs and Class Members, in their computer systems and networks, and sharing it and using it for commercial gain, Defendants owed a duty of care to use reasonable means to secure and safeguard their computer systems—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

215. Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

216. Plaintiffs and Class Members are a well-defined, foreseeable, and probable group of patients that Defendants were aware, or should have been aware, could be injured by inadequate data security measures.

217. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and consumers, which is recognized by laws and regulations including but not limited to HIPAA, the FTC Act, and common law. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

218. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

219. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

220. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

221. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;
b. Failing to adequately monitor the security of their networks and systems;
c. Failing to ensure that their email systems had plans in place to maintain reasonable data security safeguards;
d. Failing to have in place mitigation policies and procedures;
e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;
f. Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and
g. Failing to timely notify Plaintiffs and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

222. Plaintiffs and Class Members have no ability to protect their Private Information that was or remains in Defendants' possession.

223. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

224. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in one or more types of injuries to Plaintiffs and Class Members. In addition, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

225. Defendants' conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information, and failing to provide Plaintiffs and Class Members with timely notice that their sensitive Private Information had been compromised.

226. Neither Plaintiffs nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

227. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

228. The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

229. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

**COUNT II**
**Breach of Implied Contract**
***(By Plaintiffs Individually and on Behalf of the Class)***

230. Plaintiffs re-allege and incorporate by reference paragraphs 1-212 as if fully set forth herein.

231. Defendants acquired and maintained the Private Information of Plaintiffs and the Class that they received either directly or from their healthcare providers.

232. When Plaintiffs and Class Members paid money and provided their Private Information to their doctors and/or healthcare providers, either directly or indirectly, in exchange for goods or services, they entered into implied contracts with their doctors and/or healthcare professionals, their business associates, revenue service providers, and other service providers, including Defendants.

233. Plaintiffs and Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

234. Plaintiffs and the Class were required to deliver their Private Information to Defendants as part of the process of obtaining services provided by Defendants. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services.

235. Defendant Cook County Health solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and

Class Members accepted Defendant Cook County Health's offers and provided their Private Information to Cook County Health, or, alternatively, provided their information to doctors or other healthcare professionals, who then provided it to Cook County Health. In turn, Cook County Health provided that same Private Information to Defendant PJ&A in the course of using PJ&A's medical transcription services.

236. Defendants accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members and/or their doctors and other healthcare professionals.

237. In accepting such information and payment for services, Defendants entered into implied contracts with Plaintiffs and Class Members whereby Defendants became obligated to reasonably safeguard Plaintiffs' and Class Members' Private Information.

238. Alternatively, Plaintiffs and Class Members were the intended beneficiaries of data protection agreements entered into between Defendants and healthcare providers.

239. In delivering, directly or indirectly, their Private Information to Defendants and paying for healthcare services, Plaintiffs and Class Members intended and understood that Defendants would adequately safeguard the data as part of that service.

240. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

241. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of their agents is

restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

242. Plaintiffs and Class Members (or their doctors and healthcare providers) would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

243. Had Defendants disclosed to Plaintiffs and Class Members (or their doctors and healthcare providers) that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members (or their doctors and healthcare providers) would not have provided their Private Information to Defendants.

244. Defendants recognized that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and Class Members (or their doctors and healthcare providers).

245. Plaintiffs and Class Members (or their doctors and healthcare providers) fully performed their obligations under the implied contracts with Defendants.

246. Defendants breached the implied contracts with Plaintiffs and Class Members (or their doctors and healthcare providers) by failing to take reasonable measures to safeguard their Private Information as described herein.

247. As a direct and proximate result of Defendants' conduct, Plaintiffs and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

**COUNT III**
**Unjust Enrichment, in the Alternative**
***(By Plaintiffs Individually and on Behalf of the Class)***

248. Plaintiffs re-allege and incorporate by reference paragraphs 1-212 as if fully set forth herein.

249. This count is pleaded in the alternative to breach of contract.

250. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from money they make based upon protecting Plaintiffs' and Class Members' Private Information.

251. There is a direct nexus between money paid to Defendants and the requirement that Defendants keep Plaintiffs' and Class Members' Private Information confidential and protected.

252. Plaintiffs and Class Members paid Defendants and/or healthcare providers a certain sum of money, which was used to fund data security via contracts with Defendants.

253. As such, a portion of the payments made by or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

254. Protecting the Private Information of Plaintiffs and Class Members is integral to Defendants' businesses. Without their data, Defendant Cook County Health would be unable to provide the healthcare services comprising Defendant Cook County Health's core business, and Defendant PJ&A would be unable to provide the medical transcription services comprising Defendant PJ&A's core business.

255. Plaintiffs' and Class Members' data and Private Information has monetary value.

256. Plaintiffs and Class Members directly and indirectly conferred a monetary benefit on Defendants. They indirectly conferred a monetary benefit on Defendants by purchasing goods

and/or services from entities that contracted with Defendants, and from which Defendants received compensation to protect certain data. Plaintiffs and Class Members directly conferred a monetary benefit on Defendants by supplying Private Information, which has value, from which value Defendants derive their business value, and which should have been protected with adequate data security.

257. Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

258. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failures to provide the requisite security.

259. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

260. Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

261. If Plaintiffs and Class Members knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants (or to their physician to provide to Defendants).

262. Plaintiffs and Class Members have no adequate remedy at law.

263. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; (vii) loss or privacy from the authorized access and exfiltration of their Private Information; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

264. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

265. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from

them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

**COUNT IV**
**Bailment**
**(*By Plaintiffs Individually and on Behalf of the Class*)**

266. Plaintiffs re-allege and incorporate by reference paragraphs 1-212 as if fully set forth herein.

267. Plaintiffs and Class Members provided Private Information to Defendants—either directly or through healthcare providers and their business associates—which Defendants were under a duty to keep private and confidential.

268. Plaintiffs' and Class Members' Private Information is personal property, and was conveyed to Defendants for the certain purpose of keeping the information private and confidential.

269. Plaintiffs' and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendants were aware of the risks they took when accepting the Private Information for safeguarding and assumed the risk voluntarily.

270. Once Defendants accepted Plaintiffs' and Class Members' Private Information, they were in the exclusive possession of that information, and neither Plaintiffs nor Class Members could control that information once it was within the possession, custody, and control of Defendants.

271. Defendants did not safeguard Plaintiffs' or Class Members' Private Information when they failed to adopt and enforce adequate security safeguards to prevent the known risk of a cyberattack.

272. Defendants' failure to safeguard Plaintiffs' and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

273. As a result of Defendants' failure to keep Plaintiffs' and Class Members' Private Information secure, Plaintiffs and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

**COUNT V**
**Breach of Fiduciary Duty**
***(By Plaintiffs Individually and on Behalf of the Class)***

274. Plaintiffs re-allege and incorporate by reference paragraphs 1-212 as if fully set forth herein.

275. In light of the special relationship between Defendants and Plaintiffs and Class Members, Defendants became fiduciaries by undertaking a guardianship of the Private Information to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants do store.

276. Defendants had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship with patients (or the patients of their healthcare clients), in particular, to keep secure their Private Information.

277. Defendants breached their fiduciary duty to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

278. Defendants breached their fiduciary duty to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

279. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendants' services they received.

280. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a) For an Order certifying this action as a Class Action and appointing Plaintiffs as Class Representative and his counsel as Class Counsel;

b) For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to

Plaintiffs and Class Members;

c) For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

e) Ordering Defendants to pay for not less than five years of credit monitoring services for Plaintiffs and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of punitive damages, as allowable by law;

h) Pre- and post-judgment interest on any amounts awarded; and,

i) Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: June 14, 2024

Respectfully submitted,

*/s/ Thomas A. Zimmerman, Jr.*

Thomas A. Zimmerman, Jr.
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
tom@attorneyzim.com

James J. Pizzirusso*
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: jpizzirusso@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
Email: snathan@hausfeld.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Terence R. Coates*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 665-0204
Fax: (513) 665-0219
tcoates@msdlegal.com

M. Anderson Berry
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: 916.239.4778
Fax: 916.924.1829
aberry@justice4you.com

***Counsel for Plaintiffs***

****Pro Hac Vice Forthcoming***

# EXHIBIT A

195973

COOK COUNTY HEALTH

Return to IDX:
P.O. Box 989728
West Sacramento, CA 95798-9728

1128-195973

Bridget Oneill
[redacted]

November 7, 2023

**Notice of Data Security Incident**

Dear Bridget Oneill,

Enclosed is a letter from Perry Johnson & Associates, Inc. (PJ&A) about a data security incident that may have affected some of your personal information. PJ&A previously provided medical transcription services for Cook County Health (CCH). The attached letter from PJ&A contains more details about the incident and the impact to your information.

Once we learned of the incident, CCH immediately stopped sharing information with PJ&A and ended our work with them. You should review your medical bills and let us know if you see anything suspicious. Please also review the "Recommended Steps" section included with this letter. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission on identity theft protection and details on how to place a fraud alert or a security freeze on your credit file.

**For More Information:**

Protecting your information is important to us. We apologize for this incident.

Please call (888) 867-3881 with any additional questions you may have Monday through Friday, excluding holidays, between 8 am and 8 pm Central Time.

This notice is available in other languages at https://cookcountyhealth.org/compliance-notice/.

- Si desea leer este mensaje en español, por favor visite https://cookcountyhealth.org/compliance-notice/
- Jeśli ta wiadomość ma zostać wyświetlona w języku polskim, proszę przejść na stronę https://cookcountyhealth.org/compliance-notice/
- Если вы хотите прочитать это сообщение на русском языке, посетите https://cookcountyhealth.org/compliance-notice/
- 若想阅读此信息的中文版本，请访问 https://cookcountyhealth.org/compliance-notice/
- अगर आप यह मैसेज हिन्दी में पढ़ना चाहते हैं, तो कृपया https://cookcountyhealth.org/compliance-notice/ पर जाएं
- ذا كنت ترغب في قراءة هذه الرسالة باللغة العربية، يرجى زيارة الموقع https://cookcountyhealth.org/compliance-notice/

Sincerely,

*Cook County Health*

Cook County Health

COOK COUNTY
HEALTH

Return to IDX:
P.O. Box 989728
West Sacramento, CA 95798-9728

2196-382199

Kirk Moses
[redacted]

November 7, 2023

**Notice of Data Security Incident**

Dear Kirk Moses,

Enclosed is a letter from Perry Johnson & Associates, Inc. (PJ&A) about a data security incident that may have affected some of your personal information. PJ&A previously provided medical transcription services for Cook County Health (CCH). The attached letter from PJ&A contains more details about the incident and the impact to your information.

Once we learned of the incident, CCH immediately stopped sharing information with PJ&A and ended our work with them. You should review your medical bills and let us know if you see anything suspicious. Please also review the "Recommended Steps" section included with this letter. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission on identity theft protection and details on how to place a fraud alert or a security freeze on your credit file.

**For More Information:**

Protecting your information is important to us. We apologize for this incident.

Please call (888) 867-3881 with any additional questions you may have Monday through Friday, excluding holidays, between 8 am and 8 pm Central Time.

This notice is available in other languages at https://cookcountyhealth.org/compliance-notice/.

- Si desea leer este mensaje en español, por favor visite https://cookcountyhealth.org/compliance-notice/
- Jeśli ta wiadomość ma zostać wyświetlona w języku polskim, proszę przejść na stronę https://cookcountyhealth.org/compliance-notice/
- Если вы хотите прочитать это сообщение на русском языке, посетите https://cookcountyhealth.org/compliance-notice/
- 若想阅读此信息的中文版本，请访问 https://cookcountyhealth.org/compliance-notice/
- अगर आप यह मैसेज हिन्दी में पढ़ना चाहते हैं, तो कृपया https://cookcountyhealth.org/compliance-notice/ पर जाएं
- ذا كنت ترغب في قراءة هذه الرسالة باللغة العربية، يرجى زيارة الموقع https://cookcountyhealth.org/compliance-notice/

Sincerely,

*Cook County Health*

Cook County Health

## Recommended Steps to Help Protect Your Information

**1. Review your credit reports.** We recommend that you remain vigilant by reviewing account statements and monitoring credit reports. Under federal law, you also are entitled every 12 months to one free copy of your credit report from each of the three major credit reporting companies. To obtain a free annual credit report, go to www.annualcreditreport.com or call 1-877-322-8228. You may wish to stagger your requests so that you receive a free report by one of the three credit bureaus every four months.

You should also know that you have the right to file a police report if you ever experience identity fraud. Please note that in order to file a crime report or incident report with law enforcement for identity theft, you will likely need to provide some kind of proof that you have been a victim. A police report is often required to dispute fraudulent items. You can report suspected incidents of identity theft to local law enforcement or to the Attorney General.

**2. Place Fraud Alerts** with the three credit bureaus. If you choose to place a fraud alert, we recommend you do this after activating your credit monitoring. You can place a fraud alert at one of the three major credit bureaus by phone and also via Experian's or Equifax's website. A fraud alert tells creditors to follow certain procedures, including contacting you, before they open any new accounts or change your existing accounts. For that reason, placing a fraud alert can protect you, but also may delay you when you seek to obtain credit. The contact information for all three bureaus is as follows:

**Credit Bureaus**

| | | |
|---|---|---|
| Equifax Fraud Reporting | Experian Fraud Reporting | TransUnion Fraud Reporting |
| 1-866-349-5191 | 1-888-397-3742 | 1-800-680-7289 |
| P.O. Box 105069 | P.O. Box 9554 | P.O. Box 2000 |
| Atlanta, GA 30348-5069 | Allen, TX 75013 | Chester, PA 19022-2000 |
| www.equifax.com | www.experian.com | www.transunion.com |

It is necessary to contact only ONE of these bureaus and use only ONE of these methods. As soon as one of the three bureaus confirms your fraud alert, the others are notified to place alerts on their records as well.

You will receive confirmation letters in the mail and will then be able to order all three credit reports, free of charge, for your review. An initial fraud alert will last for one year.

**Please Note: No one is allowed to place a fraud alert on your credit report except you.**

**3. Security Freeze.** By placing a security freeze, someone who fraudulently acquires your personal identifying information will not be able to use that information to open new accounts or borrow money in your name. You will need to contact the three national credit reporting bureaus listed above to place the freeze. Keep in mind that when you place the freeze, you will not be able to borrow money, obtain instant credit, or get a new credit card until you temporarily lift or permanently remove the freeze. There is no cost to freeze or unfreeze your credit files.

**4. You can obtain additional information** about the steps you can take to avoid identity theft from the following agencies. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them.

**California Residents:** Visit the California Office of Privacy Protection (www.oag.ca.gov/privacy) for additional information on protection against identity theft.

**Kentucky Residents:** Office of the Attorney General of Kentucky, 700 Capitol Avenue, Suite 118 Frankfort, Kentucky 40601, www.ag.ky.gov, Telephone: 1-502-696-5300.

**Maryland Residents:** Office of the Attorney General of Maryland, Consumer Protection Division 200 St. Paul Place Baltimore, MD 21202, www.oag.state.md.us/Consumer, Telephone: 1-888-743-0023.

**New Mexico Residents:** You have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for

PJ&A

**Re: NOTICE OF DATA SECURITY INCIDENT BY PERRY JOHNSON & ASSOCIATES**

Dear Kirk Moses:

Perry Johnson & Associates, Inc. ("PJ&A," "we," or "us") provides this letter to notify you about a data security incident ("incident"), which may have affected the privacy and security of your protected health information. The letter describes the incident and our response to the incident. It also describes resources which will be made available to you, which may help protect your protected health information from potential misuse.

**What Is PJ&A?** PJ&A is a former vendor who provided services to Cook County Health ("CCH"). Specifically, PJ&A provided certain transcription and related services to CCH. In order to provide these services, PJ&A received protected health information from CCH about its patients.

**What Happened?** PJ&A became aware of a potential data security incident impacting our systems on May 2, 2023. The incident appeared to involve access to PJ&A data by an unauthorized third party. We immediately initiated an investigation and engaged a cybersecurity vendor to support our investigation and secure our network against potential system vulnerabilities. We also promptly implemented the recommendations provided by our cybersecurity vendor to prevent the further disclosure of data as we continued to investigate the situation.

On May 22, 2023, we preliminarily determined that an unauthorized third party had accessed PJ&A data and that CCH data contained on PJ&A systems was likely impacted by this event, although further investigation would be required to determine the scope of the impacted data. On July 21, 2023, while the investigation remained ongoing, we provided initial notice to CCH that an unauthorized third party had accessed and downloaded certain files from our systems, and that this data included CCH data. On October 9, 2023, we confirmed the overall scope of the customer data impacted and provided this information to CCH.

**What Information Was Involved?** We have confirmed that a PJ&A database containing your protected health information was impacted by this incident. Specifically, the following of your information may have been impacted: your name, date of birth, address, gender, medical record number, account number, and clinical information such as the name of the treatment facility, the name of your health care providers, admit diagnosis, and date(s) and time(s) of service.

**What Actions Did We Take?** PJ&A is committed to maintaining the privacy and security of your information and we take this incident very seriously. We have taken, and will continue to take, appropriate steps to address this incident, including updating our systems to prevent incidents of this nature from occurring in the future. Upon learning of this incident, CCH stopped sharing data with PJ&A.

As soon as we learned of the potential unauthorized access to our systems, we immediately initiated an investigation and retained a cybersecurity vendor to assist with containing the threat and with further securing our systems. We also notified law enforcement about the incident and will continue to cooperate with law enforcement's investigation. We further implemented additional technical restrictions in our systems, and we required a password reset for all employees. Additionally, with the assistance of our cybersecurity vendor, we deployed an endpoint detection and response system to monitor any unauthorized access of our systems. We have also taken additional steps to ensure that no patient data was made public, and, to date, we have not identified any evidence that the unauthorized actor has further disclosed and/or made any observable use of the data.

**What Can You Do?** We encourage you to regularly review your financial accounts and report any suspicious or unrecognized activity immediately. The Recommended Steps to Help Protected Your Information document provides further information about what you can do. As recommended by federal regulatory agencies, you should carefully

your credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit reports to be provided to employers; you may limit "prescreened" offers of credit and insurance you get based on information in your credit report; and you may seek damages from a violator. You may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. You can review your rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

**New York Residents:** the Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; https://ag.ny.gov/.

**North Carolina Residents:** Office of the Attorney General of North Carolina, 9001 Mail Service Center Raleigh, NC 27699-9001, www.ncdoj.gov, Telephone: 1-919-716-6400.

**Oregon Residents:** Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, www.doj.state.or.us/, Telephone: 877-877-9392.

**Rhode Island Residents:** Office of the Attorney General, 150 South Main Street, Providence, Rhode Island 02903, www.riag.ri.gov, Telephone: 401-274-4400. A total of 50 Rhode Island residents were notified of this event.

**All US Residents:** Identity Theft Clearinghouse, Federal Trade Commission, 600 Pennsylvania Avenue, NW Washington, DC 20580, www.consumer.gov/idtheft, 1-877-IDTHEFT (438-4338), TTY: 1-866-653-4261.

PJ&A

**Re: NOTICE OF DATA SECURITY INCIDENT BY PERRY JOHNSON & ASSOCIATES**

Dear Michael Newton:

Perry Johnson & Associates, Inc. ("PJ&A," "we," or "us") provides this letter to notify you about a data security incident ("incident"), which may have affected the privacy and security of your protected health information. The letter describes the incident and our response to the incident. It also describes resources which will be made available to you, which may help protect your protected health information from potential misuse.

**What Is PJ&A?** PJ&A is a former vendor who provided services to Cook County Health ("CCH"). Specifically, PJ&A provided certain transcription and related services to CCH. In order to provide these services, PJ&A received protected health information from CCH about its patients.

**What Happened?** PJ&A became aware of a potential data security incident impacting our systems on May 2, 2023. The incident appeared to involve access to PJ&A data by an unauthorized third party. We immediately initiated an investigation and engaged a cybersecurity vendor to support our investigation and secure our network against potential system vulnerabilities. We also promptly implemented the recommendations provided by our cybersecurity vendor to prevent the further disclosure of data as we continued to investigate the situation.

On May 22, 2023, we preliminarily determined that an unauthorized third party had accessed PJ&A data and that CCH data contained on PJ&A systems was likely impacted by this event, although further investigation would be required to determine the scope of the impacted data. On July 21, 2023, while the investigation remained ongoing, we provided initial notice to CCH that an unauthorized third party had accessed and downloaded certain files from our systems, and that this data included CCH data. On October 9, 2023, we confirmed the overall scope of the customer data impacted and provided this information to CCH.

**What Information Was Involved?** We have confirmed that a PJ&A database containing your protected health information was impacted by this incident. Specifically, the following of your information may have been impacted: your name, date of birth, address, gender, medical record number, account number, and clinical information such as the name of the treatment facility, the name of your health care providers, admit diagnosis, and date(s) and time(s) of service.

**What Actions Did We Take?** PJ&A is committed to maintaining the privacy and security of your information and we take this incident very seriously. We have taken, and will continue to take, appropriate steps to address this incident, including updating our systems to prevent incidents of this nature from occurring in the future. Upon learning of this incident, CCH stopped sharing data with PJ&A.

As soon as we learned of the potential unauthorized access to our systems, we immediately initiated an investigation and retained a cybersecurity vendor to assist with containing the threat and with further securing our systems. We also notified law enforcement about the incident and will continue to cooperate with law enforcement's investigation. We further implemented additional technical restrictions in our systems, and we required a password reset for all employees. Additionally, with the assistance of our cybersecurity vendor, we deployed an endpoint detection and response system to monitor any unauthorized access of our systems. We have also taken additional steps to ensure that no patient data was made public, and, to date, we have not identified any evidence that the unauthorized actor has further disclosed and/or made any observable use of the data.

**What Can You Do?** We encourage you to regularly review your financial accounts and report any suspicious or unrecognized activity immediately. The Recommended Steps to Help Protected Your Information document provides further information about what you can do. As recommended by federal regulatory agencies, you should carefully

COOK COUNTY HEALTH

Return to IDX:
P.O. Box 989728
West Sacramento, CA 95798-9728

2776-478379

Michael Newton
[redacted]

November 7, 2023

**Notice of Data Security Incident**

Dear Michael Newton,

Enclosed is a letter from Perry Johnson & Associates, Inc. (PJ&A) about a data security incident that may have affected some of your personal information. PJ&A previously provided medical transcription services for Cook County Health (CCH). The attached letter from PJ&A contains more details about the incident and the impact to your information.

Once we learned of the incident, CCH immediately stopped sharing information with PJ&A and ended our work with them. You should review your medical bills and let us know if you see anything suspicious. Please also review the "Recommended Steps" section included with this letter. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission on identity theft protection and details on how to place a fraud alert or a security freeze on your credit file.

**For More Information:**

Protecting your information is important to us. We apologize for this incident.

Please call (888) 867-3881 with any additional questions you may have Monday through Friday, excluding holidays, between 8 am and 8 pm Central Time.

This notice is available in other languages at https://cookcountyhealth.org/compliance-notice/.

- Si desea leer este mensaje en español, por favor visite https://cookcountyhealth.org/compliance-notice/
- Jeśli ta wiadomość ma zostać wyświetlona w języku polskim, proszę przejść na stronę https://cookcountyhealth.org/compliance-notice/
- Если вы хотите прочитать это сообщение на русском языке, посетите https://cookcountyhealth.org/compliance-notice/
- 若想阅读此信息的中文版本，请访问 https://cookcountyhealth.org/compliance-notice/
- अगर आप यह मैसेज हिन्दी में पढ़ना चाहते हैं, तो कृपया https://cookcountyhealth.org/compliance-notice/ पर जाएं
- ذا كنت ترغب في قراءة هذه الرسالة باللغة العربية، يرجى زيارة الموقع https://cookcountyhealth.org/compliance-notice/

Sincerely,

*Cook County Health*

Cook County Health

291461

COOK COUNTY
HEALTH

Return to IDX:
P.O. Box 989728
West Sacramento, CA 95798-9728

1675-291461

Noel Carter
[redacted]

November 7, 2023

**Notice of Data Security Incident**

Dear Noel Carter,

Enclosed is a letter from Perry Johnson & Associates, Inc. (PJ&A) about a data security incident that may have affected some of your personal information. PJ&A previously provided medical transcription services for Cook County Health (CCH). The attached letter from PJ&A contains more details about the incident and the impact to your information.

Once we learned of the incident, CCH immediately stopped sharing information with PJ&A and ended our work with them. You should review your medical bills and let us know if you see anything suspicious. Please also review the "Recommended Steps" section included with this letter. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission on identity theft protection and details on how to place a fraud alert or a security freeze on your credit file.

**For More Information:**

Protecting your information is important to us. We apologize for this incident.

Please call (888) 867-3881 with any additional questions you may have Monday through Friday, excluding holidays, between 8 am and 8 pm Central Time.

This notice is available in other languages at https://cookcountyhealth.org/compliance-notice/.

- Si desea leer este mensaje en español, por favor visite https://cookcountyhealth.org/compliance-notice/
- Jeśli ta wiadomość ma zostać wyświetlona w języku polskim, proszę przejść na stronę https://cookcountyhealth.org/compliance-notice/
- Если вы хотите прочитать это сообщение на русском языке, посетите https://cookcountyhealth.org/compliance-notice/
- 若想阅读此信息的中文版本，请访问 https://cookcountyhealth.org/compliance-notice/
- अगर आप यह मैसेज हिन्दी में पढ़ना चाहते हैं, तो कृपया https://cookcountyhealth.org/compliance-notice/ पर जाएं
- إذا كنت ترغب في قراءة هذه الرسالة باللغة العربية، يرجى زيارة الموقع https://cookcountyhealth.org/compliance-notice/

Sincerely,

*Cook County Health*

Cook County Health

049386

COOK COUNTY
HEALTH

Return to IDX:
P.O. Box 989728
West Sacramento, CA 95798-9728

284-049386

Martin Kurtev
[redacted]

November 7, 2023

**Notice of Data Security Incident**

Dear Martin Kurtev,

Enclosed is a letter from Perry Johnson & Associates, Inc. (PJ&A) about a data security incident that may have affected some of your personal information. PJ&A previously provided medical transcription services for Cook County Health (CCH). The attached letter from PJ&A contains more details about the incident and the impact to your information.

Once we learned of the incident, CCH immediately stopped sharing information with PJ&A and ended our work with them. You should review your medical bills and let us know if you see anything suspicious. Please also review the "Recommended Steps" section included with this letter. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission on identity theft protection and details on how to place a fraud alert or a security freeze on your credit file.

**For More Information:**

Protecting your information is important to us. We apologize for this incident.

Please call (888) 867-3881 with any additional questions you may have Monday through Friday, excluding holidays, between 8 am and 8 pm Central Time.

This notice is available in other languages at https://cookcountyhealth.org/compliance-notice/.

- Si desea leer este mensaje en español, por favor visite https://cookcountyhealth.org/compliance-notice/
- Jeśli ta wiadomość ma zostać wyświetlona w języku polskim, proszę przejść na stronę https://cookcountyhealth.org/compliance-notice/
- Если вы хотите прочитать это сообщение на русском языке, посетите https://cookcountyhealth.org/compliance-notice/
- 若想阅读此信息的中文版本，请访问 https://cookcountyhealth.org/compliance-notice/
- अगर आप यह मैसेज हिन्दी में पढ़ना चाहते हैं, तो कृपया https://cookcountyhealth.org/compliance-notice/ पर जाएं
- ذا كنت ترغب في قراءة هذه الرسالة باللغة العربية، يرجى زيارة الموقع https://cookcountyhealth.org/compliance-notice/

Sincerely,

*Cook County Health*

Cook County Health

## Recommended Steps to Help Protect Your Information

**1. Review your credit reports.** We recommend that you remain vigilant by reviewing account statements and monitoring credit reports. Under federal law, you also are entitled every 12 months to one free copy of your credit report from each of the three major credit reporting companies. To obtain a free annual credit report, go to www.annualcreditreport.com or call 1-877-322-8228. You may wish to stagger your requests so that you receive a free report by one of the three credit bureaus every four months.

You should also know that you have the right to file a police report if you ever experience identity fraud. Please note that in order to file a crime report or incident report with law enforcement for identity theft, you will likely need to provide some kind of proof that you have been a victim. A police report is often required to dispute fraudulent items. You can report suspected incidents of identity theft to local law enforcement or to the Attorney General.

**2. Place Fraud Alerts** with the three credit bureaus. If you choose to place a fraud alert, we recommend you do this after activating your credit monitoring. You can place a fraud alert at one of the three major credit bureaus by phone and also via Experian's or Equifax's website. A fraud alert tells creditors to follow certain procedures, including contacting you, before they open any new accounts or change your existing accounts. For that reason, placing a fraud alert can protect you, but also may delay you when you seek to obtain credit. The contact information for all three bureaus is as follows:

**Credit Bureaus**

| | | |
|---|---|---|
| Equifax Fraud Reporting | Experian Fraud Reporting | TransUnion Fraud Reporting |
| 1-866-349-5191 | 1-888-397-3742 | 1-800-680-7289 |
| P.O. Box 105069 | P.O. Box 9554 | P.O. Box 2000 |
| Atlanta, GA 30348-5069 | Allen, TX 75013 | Chester, PA 19022-2000 |
| www.equifax.com | www.experian.com | www.transunion.com |

It is necessary to contact only ONE of these bureaus and use only ONE of these methods. As soon as one of the three bureaus confirms your fraud alert, the others are notified to place alerts on their records as well.

You will receive confirmation letters in the mail and will then be able to order all three credit reports, free of charge, for your review. An initial fraud alert will last for one year.

**Please Note: No one is allowed to place a fraud alert on your credit report except you.**

**3. Security Freeze.** By placing a security freeze, someone who fraudulently acquires your personal identifying information will not be able to use that information to open new accounts or borrow money in your name. You will need to contact the three national credit reporting bureaus listed above to place the freeze. Keep in mind that when you place the freeze, you will not be able to borrow money, obtain instant credit, or get a new credit card until you temporarily lift or permanently remove the freeze. There is no cost to freeze or unfreeze your credit files.

**4. You can obtain additional information** about the steps you can take to avoid identity theft from the following agencies. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them.

**California Residents:** Visit the California Office of Privacy Protection (www.oag.ca.gov/privacy) for additional information on protection against identity theft.

**Kentucky Residents:** Office of the Attorney General of Kentucky, 700 Capitol Avenue, Suite 118 Frankfort, Kentucky 40601, www.ag.ky.gov, Telephone: 1-502-696-5300.

**Maryland Residents:** Office of the Attorney General of Maryland, Consumer Protection Division 200 St. Paul Place Baltimore, MD 21202, www.oag.state.md.us/Consumer, Telephone: 1-888-743-0023.

**New Mexico Residents:** You have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for

049386

your credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit reports to be provided to employers; you may limit "prescreened" offers of credit and insurance you get based on information in your credit report; and you may seek damages from a violator. You may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. You can review your rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

**New York Residents:** the Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; https://ag.ny.gov/.

**North Carolina Residents:** Office of the Attorney General of North Carolina, 9001 Mail Service Center Raleigh, NC 27699-9001, www.ncdoj.gov, Telephone: 1-919-716-6400.

**Oregon Residents:** Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, www.doj.state.or.us/, Telephone: 877-877-9392.

**Rhode Island Residents:** Office of the Attorney General, 150 South Main Street, Providence, Rhode Island 02903, www.riag.ri.gov, Telephone: 401-274-4400. A total of 50 Rhode Island residents were notified of this event.

**All US Residents:** Identity Theft Clearinghouse, Federal Trade Commission, 600 Pennsylvania Avenue, NW Washington, DC 20580, www.consumer.gov/idtheft, 1-877-IDTHEFT (438-4338), TTY: 1-866-653-4261.

**Re: NOTICE OF DATA SECURITY INCIDENT BY PERRY JOHNSON & ASSOCIATES**

Dear Martin Kurtev:

Perry Johnson & Associates, Inc. ("PJ&A," "we," or "us") provides this letter to notify you about a data security incident ("incident"), which may have affected the privacy and security of your protected health information. The letter describes the incident and our response to the incident. It also describes resources which will be made available to you, which may help protect your protected health information from potential misuse.

**What Is PJ&A?** PJ&A is a former vendor who provided services to Cook County Health ("CCH"). Specifically, PJ&A provided certain transcription and related services to CCH. In order to provide these services, PJ&A received protected health information from CCH about its patients.

**What Happened?** PJ&A became aware of a potential data security incident impacting our systems on May 2, 2023. The incident appeared to involve access to PJ&A data by an unauthorized third party. We immediately initiated an investigation and engaged a cybersecurity vendor to support our investigation and secure our network against potential system vulnerabilities. We also promptly implemented the recommendations provided by our cybersecurity vendor to prevent the further disclosure of data as we continued to investigate the situation.

On May 22, 2023, we preliminarily determined that an unauthorized third party had accessed PJ&A data and that CCH data contained on PJ&A systems was likely impacted by this event, although further investigation would be required to determine the scope of the impacted data. On July 21, 2023, while the investigation remained ongoing, we provided initial notice to CCH that an unauthorized third party had accessed and downloaded certain files from our systems, and that this data included CCH data. On October 9, 2023, we confirmed the overall scope of the customer data impacted and provided this information to CCH.

**What Information Was Involved?** We have confirmed that a PJ&A database containing your protected health information was impacted by this incident. Specifically, the following of your information may have been impacted: your name, date of birth, address, gender, medical record number, account number, and clinical information such as the name of the treatment facility, the name of your health care providers, admit diagnosis, and date(s) and time(s) of service.

**What Actions Did We Take?** PJ&A is committed to maintaining the privacy and security of your information and we take this incident very seriously. We have taken, and will continue to take, appropriate steps to address this incident, including updating our systems to prevent incidents of this nature from occurring in the future. Upon learning of this incident, CCH stopped sharing data with PJ&A.

As soon as we learned of the potential unauthorized access to our systems, we immediately initiated an investigation and retained a cybersecurity vendor to assist with containing the threat and with further securing our systems. We also notified law enforcement about the incident and will continue to cooperate with law enforcement's investigation. We further implemented additional technical restrictions in our systems, and we required a password reset for all employees. Additionally, with the assistance of our cybersecurity vendor, we deployed an endpoint detection and response system to monitor any unauthorized access of our systems. We have also taken additional steps to ensure that no patient data was made public, and, to date, we have not identified any evidence that the unauthorized actor has further disclosed and/or made any observable use of the data.

**What Can You Do?** We encourage you to regularly review your financial accounts and report any suspicious or unrecognized activity immediately. The Recommended Steps to Help Protected Your Information document provides further information about what you can do. As recommended by federal regulatory agencies, you should carefully

monitor your accounts for the next 12 to 24 months and report any suspected incidents of fraud to the relevant financial institution.

**Other Important Information.** The privacy and security of your protected health information is of the utmost importance to us. We sincerely regret this occurrence and apologize for any inconvenience or concern that it may cause you. If you have questions or would like more information, please call (888) 867-3881 Monday through Friday from 8 am - 8 pm Central Time.

Sincerely,

Perry Johnson & Associates, Inc.

049385

COOK COUNTY
HEALTH

Return to IDX:
P.O. Box 989728
West Sacramento, CA 95798-9728

284-049385

Izabela Debowczyk
[redacted]

November 7, 2023

**Notice of Data Security Incident**

Dear Izabela Debowczyk,

Enclosed is a letter from Perry Johnson & Associates, Inc. (PJ&A) about a data security incident that may have affected some of your personal information. PJ&A previously provided medical transcription services for Cook County Health (CCH). The attached letter from PJ&A contains more details about the incident and the impact to your information.

Once we learned of the incident, CCH immediately stopped sharing information with PJ&A and ended our work with them. You should review your medical bills and let us know if you see anything suspicious. Please also review the "Recommended Steps" section included with this letter. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission on identity theft protection and details on how to place a fraud alert or a security freeze on your credit file.

**For More Information:**

Protecting your information is important to us. We apologize for this incident.

Please call (888) 867-3881 with any additional questions you may have Monday through Friday, excluding holidays, between 8 am and 8 pm Central Time.

This notice is available in other languages at https://cookcountyhealth.org/compliance-notice/.

- Si desea leer este mensaje en español, por favor visite https://cookcountyhealth.org/compliance-notice/
- Jeśli ta wiadomość ma zostać wyświetlona w języku polskim, proszę przejść na stronę https://cookcountyhealth.org/compliance-notice/
- Если вы хотите прочитать это сообщение на русском языке, посетите https://cookcountyhealth.org/compliance-notice/
- 若想阅读此信息的中文版本，请访问 https://cookcountyhealth.org/compliance-notice/
- अगर आप यह मैसेज हिन्दी में पढ़ना चाहते हैं, तो कृपया https://cookcountyhealth.org/compliance-notice/ पर जाएं
- ذا كنت ترغب في قراءة هذه الرسالة باللغة العربية، يرجى زيارة الموقع https://cookcountyhealth.org/compliance-notice/

Sincerely,

*Cook County Health*

Cook County Health

## Recommended Steps to Help Protect Your Information

**1. Review your credit reports.** We recommend that you remain vigilant by reviewing account statements and monitoring credit reports. Under federal law, you also are entitled every 12 months to one free copy of your credit report from each of the three major credit reporting companies. To obtain a free annual credit report, go to www.annualcreditreport.com or call 1-877-322-8228. You may wish to stagger your requests so that you receive a free report by one of the three credit bureaus every four months.

You should also know that you have the right to file a police report if you ever experience identity fraud. Please note that in order to file a crime report or incident report with law enforcement for identity theft, you will likely need to provide some kind of proof that you have been a victim. A police report is often required to dispute fraudulent items. You can report suspected incidents of identity theft to local law enforcement or to the Attorney General.

**2. Place Fraud Alerts** with the three credit bureaus. If you choose to place a fraud alert, we recommend you do this after activating your credit monitoring. You can place a fraud alert at one of the three major credit bureaus by phone and also via Experian's or Equifax's website. A fraud alert tells creditors to follow certain procedures, including contacting you, before they open any new accounts or change your existing accounts. For that reason, placing a fraud alert can protect you, but also may delay you when you seek to obtain credit. The contact information for all three bureaus is as follows:

**Credit Bureaus**

Equifax Fraud Reporting
1-866-349-5191
P.O. Box 105069
Atlanta, GA 30348-5069
www.equifax.com

Experian Fraud Reporting
1-888-397-3742
P.O. Box 9554
Allen, TX 75013
www.experian.com

TransUnion Fraud Reporting
1-800-680-7289
P.O. Box 2000
Chester, PA 19022-2000
www.transunion.com

It is necessary to contact only ONE of these bureaus and use only ONE of these methods. As soon as one of the three bureaus confirms your fraud alert, the others are notified to place alerts on their records as well.

You will receive confirmation letters in the mail and will then be able to order all three credit reports, free of charge, for your review. An initial fraud alert will last for one year.

**Please Note: No one is allowed to place a fraud alert on your credit report except you.**

**3. Security Freeze.** By placing a security freeze, someone who fraudulently acquires your personal identifying information will not be able to use that information to open new accounts or borrow money in your name. You will need to contact the three national credit reporting bureaus listed above to place the freeze. Keep in mind that when you place the freeze, you will not be able to borrow money, obtain instant credit, or get a new credit card until you temporarily lift or permanently remove the freeze. There is no cost to freeze or unfreeze your credit files.

**4. You can obtain additional information** about the steps you can take to avoid identity theft from the following agencies. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them.

**California Residents:** Visit the California Office of Privacy Protection (www.oag.ca.gov/privacy) for additional information on protection against identity theft.

**Kentucky Residents:** Office of the Attorney General of Kentucky, 700 Capitol Avenue, Suite 118 Frankfort, Kentucky 40601, www.ag.ky.gov, Telephone: 1-502-696-5300.

**Maryland Residents:** Office of the Attorney General of Maryland, Consumer Protection Division 200 St. Paul Place Baltimore, MD 21202, www.oag.state.md.us/Consumer, Telephone: 1-888-743-0023.

**New Mexico Residents:** You have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for

your credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit reports to be provided to employers; you may limit "prescreened" offers of credit and insurance you get based on information in your credit report; and you may seek damages from a violator. You may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. You can review your rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

**New York Residents:** the Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; https://ag.ny.gov/.

**North Carolina Residents:** Office of the Attorney General of North Carolina, 9001 Mail Service Center Raleigh, NC 27699-9001, www.ncdoj.gov, Telephone: 1-919-716-6400.

**Oregon Residents:** Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, www.doj.state.or.us/, Telephone: 877-877-9392.

**Rhode Island Residents:** Office of the Attorney General, 150 South Main Street, Providence, Rhode Island 02903, www.riag.ri.gov, Telephone: 401-274-4400. A total of 50 Rhode Island residents were notified of this event.

**All US Residents:** Identity Theft Clearinghouse, Federal Trade Commission, 600 Pennsylvania Avenue, NW Washington, DC 20580, www.consumer.gov/idtheft, 1-877-IDTHEFT (438-4338), TTY: 1-866-653-4261.

PJ&A

**Re: NOTICE OF DATA SECURITY INCIDENT BY PERRY JOHNSON & ASSOCIATES**

Dear Izabela Debowczyk:

Perry Johnson & Associates, Inc. ("PJ&A," "we," or "us") provides this letter to notify you about a data security incident ("incident"), which may have affected the privacy and security of your protected health information. The letter describes the incident and our response to the incident. It also describes resources which will be made available to you, which may help protect your protected health information from potential misuse.

**What Is PJ&A?** PJ&A is a former vendor who provided services to Cook County Health ("CCH"). Specifically, PJ&A provided certain transcription and related services to CCH. In order to provide these services, PJ&A received protected health information from CCH about its patients.

**What Happened?** PJ&A became aware of a potential data security incident impacting our systems on May 2, 2023. The incident appeared to involve access to PJ&A data by an unauthorized third party. We immediately initiated an investigation and engaged a cybersecurity vendor to support our investigation and secure our network against potential system vulnerabilities. We also promptly implemented the recommendations provided by our cybersecurity vendor to prevent the further disclosure of data as we continued to investigate the situation.

On May 22, 2023, we preliminarily determined that an unauthorized third party had accessed PJ&A data and that CCH data contained on PJ&A systems was likely impacted by this event, although further investigation would be required to determine the scope of the impacted data. On July 21, 2023, while the investigation remained ongoing, we provided initial notice to CCH that an unauthorized third party had accessed and downloaded certain files from our systems, and that this data included CCH data. On October 9, 2023, we confirmed the overall scope of the customer data impacted and provided this information to CCH.

**What Information Was Involved?** We have confirmed that a PJ&A database containing your protected health information was impacted by this incident. Specifically, the following of your information may have been impacted: your name, date of birth, address, gender, medical record number, account number, and clinical information such as the name of the treatment facility, the name of your health care providers, admit diagnosis, and date(s) and time(s) of service.

**What Actions Did We Take?** PJ&A is committed to maintaining the privacy and security of your information and we take this incident very seriously. We have taken, and will continue to take, appropriate steps to address this incident, including updating our systems to prevent incidents of this nature from occurring in the future. Upon learning of this incident, CCH stopped sharing data with PJ&A.

As soon as we learned of the potential unauthorized access to our systems, we immediately initiated an investigation and retained a cybersecurity vendor to assist with containing the threat and with further securing our systems. We also notified law enforcement about the incident and will continue to cooperate with law enforcement's investigation. We further implemented additional technical restrictions in our systems, and we required a password reset for all employees. Additionally, with the assistance of our cybersecurity vendor, we deployed an endpoint detection and response system to monitor any unauthorized access of our systems. We have also taken additional steps to ensure that no patient data was made public, and, to date, we have not identified any evidence that the unauthorized actor has further disclosed and/or made any observable use of the data.

**What Can You Do?** We encourage you to regularly review your financial accounts and report any suspicious or unrecognized activity immediately. The Recommended Steps to Help Protected Your Information document provides further information about what you can do. As recommended by federal regulatory agencies, you should carefully

monitor your accounts for the next 12 to 24 months and report any suspected incidents of fraud to the relevant financial institution.

**Other Important Information.** The privacy and security of your protected health information is of the utmost importance to us. We sincerely regret this occurrence and apologize for any inconvenience or concern that it may cause you. If you have questions or would like more information, please call (888) 867-3881 Monday through Friday from 8 am - 8 pm Central Time.

Sincerely,

Perry Johnson & Associates, Inc.